The next case we're going to hear today is Meridian Investments v. FHL, well, Freddie Meridian Investments, Inc. v. Federal Home Loan Mortgage, v. FHL, v. FHL, v. FHL, v. v. Federal Home Loan Mortgage, v. FHL, v. FHL, v. FHL, v. FHL, v. FHL, v. FHL, v. Good morning, Your Honors. May it please the Court. I am J. E. Nygaard, and I appear in here on behalf of my client, the appellate Meridian Investments, and I'm joined at the table by my colleague Rod Nealon. There are two issues before the Court today. First is whether Freddie Mac and FHFA are private parties, and therefore the five-year statute of limitations is applicable, or for statute of limitations purposes, are the United States making the issue is whether the binding provisions of the Memorandum of Understanding are enforceable obligations or are they unenforceable agreements to agree. If it pleases the Court, I'd like to begin with the statute of limitations issue. FHFA is not your grandparent's conservator, for good reason. That's a direct quote from the D.C. Court of Appeals in its February decision in the Perry Capital case, and we could not agree more. The Court in Perry went on to hold that the Recovery Act permitted FHFA to act in its own best governmental interests, which may include the taxpaying public's interest. That's an extraordinary defer to conservator. They're not just acting on behalf of the party in conservatorship. They get to act in their own best interest and in the taxpayer's interest. Yet today, FHFA and Freddie Mac are here arguing they're simply private parties and not the U.S. government for statute of limitation purposes. The unique and traditionally unusual powers and responsibilities of FHFA conservatorship and the impact they have on Freddie Mac requires the Court to be able to do that. Scalia. Let me just get a little background. In order to get the 6-year statute, you have to have a suit against the United States, right? McGill. Yes, Your Honor. Scalia. Now, if we were to agree with you that this is a suit against the United States, do we have jurisdiction? McGill. Yes, Your Honor. Scalia. The Court of Claims does not? You wouldn't have to bring it in the Court of Claims? McGill. No, Your Honor. I believe that in the auction company case, I think discussed this, that the sue or be sued clause that applies to Freddie Mac allows for the jurisdiction, concurrent jurisdiction within the district courts and doesn't require that the claim be brought directly in the Court of Claims. Scalia. Now you're going back to suits against Freddie Mac. I'm talking about suits against the United States. You're going to have to convert Freddie Mac into the United States for purposes of limitations. Once you do that, because the 6-year statute really requires a suit against the United States, once you get that, if we say this is a suit against the United States, don't we also have to say you have to bring it in the Court of Claims? McGill. No, I don't believe so, Your Honor. In the auction company case, there's a suit. Ginsburg. No, but that case doesn't help you. It really seems to me the problem, as I see it, is you have to pick your poison. If they're private parties, as you contend, then you run into a statute of limitation problem. But you are essentially saying if they're the United States, they have to bring it in the Court of Claims. And what the case you're giving us is different, as I recall. Is it not? It's not a suit against the United States. Which you are arguing, which is the crux of your argument. The auction company case involved the FDIC, and it was ... It was a suit against Freddie Mac, right? Our suit, Your Honor, our suit is against Freddie Mac. Your Honor, the auction case was a suit against FDIC that was brought in a district court, and the court determined that for the statute of limitations purposes, it is the United States and allowed the claim to proceed in the district court because of the suit-or-be-sued clause. But in any event — Wasn't that because it was a conservator? Well, it allowed to apply the six-year statute of limitations because of its role as a conservator in that case. And because of the suit-or-be-sued clause, it allowed that case to proceed in district court. But the other point is, is that, in any event, I mean, I believe that the Auction Company America case in the suit-or-be-sued clause allows the case to proceed concurrently in the district court. It doesn't If the Court disagrees, the case law is, I believe, pretty clear on this. It allows the case to be transferred out to the court of claims. But I don't believe that's necessary. I think the Auction Company has some point. You know, you have to have demanded a jury trial. And if it's against the United States, you can't get a jury trial. And there just seems to be a tension in the posture of your case in this — with respect to this limitations bit. All right. I believe, you know, I think a jury question is a procedural question that can be answered and dealt with at the lower court. But I don't think that there is a tension in procedural posture. I think that the Auction Company case and a series of other cases allowed suits like this to go forward under the sue-or-be-sued clause and allows for that type of concurrent jurisdiction. I think the claim probably could have been filed with the court of claims. But it's not necessary to file it in the court of claims. And the look at the — I think if you look at the case law, and I think the Auction Company case is on point, it allows those cases to proceed. And one of the reasons it allows them to proceed and it adopts the six-year statute of limitations is very similar to what the Perry Court found, that the traditional definition of conservatorship is that, and the Court uses a colloquial term, is that the conservator steps into the shoes. Well, that's not the situation here. When you step in the shoes, you acquire all the rights, titles, powers, and privileges of that entity. But here, there's additional things going on, mainly that FHFA, through Freddie Mac and its role as conservator, can act on its own best interest, as well as the taxpaying public's interest, which is exactly the same. You're saying that FHFA went beyond its statutory authority? No. What I'm saying is — Because if you look at its statutory authority, it is intended to preserve and conserve the assets of the corporation in which it's stepping into. That's not the only thing it's authorized under statute to do, and that's what the — But is it else beyond that? I'm reading the statute. I'm looking right here at the statute. The Perry Court discussed that and said, well, a lot of that uses the terms may, and it's permissive, but it says, and it's 12 U.S.C. 4617, and I think it's B2J, subparts, it allows FHFA to act in the best interest of the regulated entity and the agency. So it's not just a traditional conservator where it has to look out for the party in interest. The statute gives it additional authority and additional goals or objectives, if you will, to look out for its own interest and the taxpayer's interest. And that's what happened in this case, is that the — What I'm — I'm sorry. Please finish. But I do have a question as you're going on that I want to ask. Go ahead, Your Honor. No. I want you to — I want to make sure you fully answered Judge Niemeyer's question, but I'm just cautioning you that when you wind down, I do have one. Yes, sir. And that's what happened in this case, is that the Project America transaction wasn't taken — didn't come to fruition because of Treasury expressing overall taxpayer concerns, that as a traditional conservator, my client brokered a deal for $3.4 billion in cash to sell $3 billion in low-income housing tax credits. They ended up writing off the tax credits as worthless and turning down the $3.4 billion, not because of the interest of Freddie Mac or Freddie Mac's shareholders, but because of overall taxpayer interest. It was part of the arrangement, wasn't it, with Freddie Mac's money? It wasn't part of it. There was no arrangement in terms of Freddie Mac and FHFA had the authority to negotiate and consummate the transaction, Your Honor. Wasn't there an agreement? There was a preferred shareholders agreement between — Yeah, and wasn't that a condition of that agreement, that looking after Freddie — where did they get the money for this? Weren't they going to get some money infused in this? Well, the money on this deal, Your Honor, my client were brokers. They brought institutional investors in that were going to pay $3.4 billion to purchase the tax credits. Now, previous to that, you are correct that the Treasury Department injected money into Freddie Mac via a series of preferred shareholders agreements. Wasn't there a condition in that? There was a — It's like a bank lending money and can impose conditions. It doesn't turn the borrower into the government. What it does, it infuses help, financial help, into Freddie Mac to keep Freddie Mac afloat. Now, the later decision by the Treasury could be looking after its own money. It may not be in its own interest to do that, but that isn't — and, of course, the conservator is bound by that. But that doesn't change a conservator's powers that he's granted by statute, which is to conserve and preserve the assets of the corporation. Two different points, Your Honor. Those are different transactions that — With respect to the Department of Treasury, didn't both parties recognize very early on that Project America's ultimate viability depended on Treasury's consent? No, Your Honor. I mean, it's not required in the MOU that down the line, as they were doing the private emplacement memorandum, there's a line in there as general warning lines. I think it's debatable whether the Treasury approval is required or not. But for statute of limitations purposes, I don't — It expressly incorporated the party's understanding that Freddie Mac must first obtain all consents necessary from Freddie Mac Corporate and FHFA. And that's — And indicated that Meridian understood that Treasury's consent was necessary. That's not the case? That's different than Treasury's consent, Your Honor, is that it does say that they need to obtain the applicable consents from FHFA, right, which FHFA, stepping in the shoes of Freddie Mac, they're the one that negotiated — All necessary consents? Well, it's — FHFA, that was the only consent required? Wasn't Treasury infusing money? No, Your Honor. Treasury infusing money had nothing to do with this transaction except — It has to do with my question, though. And Treasury's role, necessary role, as needing to be consulted and consent-governing the transaction, agreement-governing the transaction. Could the transaction have gone forward after it became clear that the Department of Treasury would not agree? I think there's an argument it could have, but in reality, the transaction didn't go through because Treasury objected. Treasury had a right to say to not consent to the transaction because of its status as a preferred shareholder under the preferred shareholder agreement. And if you look at the reality, that's — That's the whole point, going back to your original argument under the statute of limitations. Treasury wasn't acting — it was acting as a preferred shareholder. It had infused money, and as a condition of that, as a condition of that, it said, we have to approve certain transactions like this one. FHFA was the conservator, and as the conservator was bound by that transaction. And so it goes back to Treasury, and Treasury says, we don't approve. And so FHA says, we don't approve. Now, you don't even satisfy the conditions of the memorandum of understanding, but quite apart from that, that doesn't make Freddie Mac the United States, or FHFA the United States. Yeah, I believe it. I believe it does because FHFA didn't have a clear exercise of authority or independence as a conservator. It was acting in the taxpayer's interest. The question is not whether or not it was — Do you concede, because I'm having some trouble, I think, pinning you down on this. Didn't you ask Treasury for its approval? No, Treasury was never formally asked for its approval, Your Honor. FHFA had some discussions with Treasury. Treasury said there's a similar, although it was materially different in a lot of respects, deal with Fannie, that they didn't want to go through, and so FHFA pulled out of the deal. Is that because Treasury expressed concerns about a Fannie deal, and that's part of our argument on the breach of the MOU, is that they never actually formally asked for Treasury's consent. FHFA made this decision, acting in its own best interest, that it was going to terminate this deal because of concern expressed by Treasury, because of a concern it had about the overall taxpayer interest basically honoring, eventually, the tax credits. And the question for the Court is not whether or not the actions of FHFA were authorized by statute or whether they're proper. It's whether or not it confers the jurisdiction, and I think the case law on that is very clear. And as relief, you're seeking what? Specific performance of the binding provisions to do what? As a relief, Your Honor, we're seeking monetary damages for the breach of the contract of the MOU. In excess of $10,000, which kicks jurisdiction, again, back to the Court of Claims. I think the option company case address that allows jurisdiction. Your Honor, you're asking me to tell you there is about 30 seconds left, and I know you had another set of questions. Actually, I worked it in. Okay. I have a question about the merits, because I don't understand your position on the merits. It seems like we're sort of heading there. Am I right, you're conceding, at least for purposes of appeal, that there is no binding obligation to actually go forward with this deal? We are conceding that there is no binding obligation to consummate the deal. The binding obligation is the binding provisions of the MOU. Okay. And so the binding provisions of the MOU that you think are relevant, I take it, are that the parties will use commercially reasonable efforts to complete the transactions and that they will cooperate and take reasonable action to ---- There in paragraph 7 and in paragraph 3a, it's take necessary appropriate actions to structure ---- I'm sorry. How did you get to paragraph 3? I didn't see paragraph 3 listed as one of the binding ones. Our position is that the ---- in paragraph 7, it agrees that they'll agree to cooperate and take reasonable actions in order to aid and assist each other in taking actions that may be necessary, appropriate ---- You don't have to talk so fast. I'm sorry. You can keep going, right? Sorry. To structure and complete the transaction that paragraph 3 tells, details what those are. No, no, no. Paragraph 12 says this whole thing is nonbinding with the exception of certain paragraphs. It doesn't list paragraph 3. So I think 3 is out. Like, otherwise, what does this mean? This is a nonexclusive list? No, Your Honor. What we say is that ---- what our position is, is that paragraph 7 says they have to take reasonable actions in order to aid and assist each other in taking such actions as may be necessary or appropriate to structure and complete the transaction. And what that is commercial, what those reasonable actions are, I think when you look to paragraph 3, it talks about exercising commercially reasonable efforts to obtain the applicable consent to execute definitive documents. So you bring ---- Which part of this ---- Oh, I'm sorry. No, you were asking this. I'll even give you 3 for present purposes. Which part of this do you think is more than what Virginia courts have said uniformly? It's just an agreement to agree. We're going to try to work this thing out. The courts have been really clear that that's not an enforceable obligation. Well, Your Honor, it's not just an agreement to negotiate. It's very much like a ---- it's a Fourth Circuit case, a Space Tech case, and they weren't met in that case because of conditions precedent, where reasonable efforts to raise capital and reasonable efforts to negotiate contracts with third parties. And in this case, I think we can say that one of the ---- it requires action by them to structure and complete the transaction, including, most tangibly, asking if they ---- to the extent they require a treasury consent, actually asking for treasury to consent to the transaction, which never occurred. Well, Virginia's ---- Virginia law is so clear, right, that these agreements to agree are not enforceable, and they all include language like this, at least in all of the cases I've looked at. They all have something about we're going to try to get this thing done. We have a preliminary agreement to agree, and we all agree, we promise we'll be reasonable, we're not going to mess around with this, we're really going to try to bring this thing home. If we say that that makes it a binding agreement, I just feel like we've blown an enforceable. I don't agree, and I think it's because ---- We kill Wall Street, indeed. Every transaction I've been familiar with, and there's been probably a dozen or more, involves these types of things. Every transaction has this type of arrangement. And every transaction, until you get to that table and sign that agreement, which they're planning to do, it's not enforceable. It usually assigns responsibilities as to who pays, who's going to do this, you pay your own costs of due diligence and that type of thing. But to enforce the contract through a clause in the Memorandum of Understanding, which explicitly says it's non-binding except for certain paragraphs, basically you want to torpedo the ultimate requirement. You want the damages as if the contract went through. I mean, you're talking about millions of dollars in damages. And it seems to me you never got the approvals that were necessary. The contract was never signed. There was no closing. There are tons of things that could have happened. All right. I think the Space Tech case, and it goes through, and it looks at the binding provisions in that MOU, and it says that at least one of the so-called binding provisions was an enforceable agreement to agree, but that other provisions, requiring aid and assistance in negotiating contracts and helping to structure financing, which was needed for the eventual deal, the court held that those were binding provisions. And so we're not – Do you cite Space Tech in your brief? Yes, Your Honor. Thank you. It's a Fourth Circuit case from 2006. And so you can hold that some – you can say some of the binding provisions, they could constitute an enforceable agreement to agree, but others aren't Is it unpublished? The Space Tech decision, Your Honor? I don't – Well, it's cited as a federal appendix site, which is usually an indicator. All right. I have it right here. There is a federal appendix site. I believe it was published, Your Honor. But that case, I think, adopts a sensible approach that you have to look at what the binding obligation is and things such as, you know, aiding and assisting in negotiating future contracts so the deal can eventually be consummated were held to be binding. And in this case, one of the binding obligations to help complete and structure a transaction is at least asking for the necessary consent, which never happened in this case. And so I think it's a tailored approach, especially, Your Honor, when we have sophisticated parties negotiating a sophisticated transaction, and part of the binding provisions – But you would – your approach to this would deny the ability of corporations to enter in these preliminary arrangements in order to arrange the path to an agreement. And if we were to hold this was – we would enforce this so as to give you the predictability of this device, which is used commercially and recognized in Virginia as unenforceable. It's got to be, or else we then – corporations wouldn't be able to use the MUOs or MOUs. And as a consequence, what would they use? Complex transactions need some guidance as to where the party's going to go to lead to an agreement. But there's an underlying understanding that that course of events is not enforceable in the end. Your Honor, there's – I think the party's words and explicit agreements have meaning, and that's why the MOU as a whole is not binding or enforceable. Specifically, the parties agreed that we are going to have these clauses be binding and enforceable. But the one that you keep relying on is not on that list. I keep coming back to that. If the party's words have meaning, why doesn't it have meaning that they listed the paragraphs that were going to be binding and the one that you keep coming back to is not on that list? Your Honor, the one that we're coming back to, and I think we're starting with, is that paragraph 7, which is on the list. But 3, the only thing that you can point to or that you are pointing to as some sort of a tangible, concrete commitment is the one to try to get consent. That's in paragraph 3. Paragraph 3 is not listed as one of the – what was the point of making this list if they didn't include the one thing that you think everybody agreed was binding? Well, Your Honor, we believe that paragraph 7 is binding. And when it talks about what's necessary and appropriate to structure and complete the transaction, that paragraph 3 is informative on that respect. But it's – Your red light's on. Why don't we bring you back up? You've got some rebuttal on this. Thank you, Your Honor. Mr. Cain. Thank you, Your Honor. May it please the Court, Howard Cain for defendant appellees. If I might start with the series of questions asked by Judge Harris, that is absolutely correct, and I will restrain myself from unnecessary commentary. But when you look at what they've reduced this appeal to, they've reduced the appeal to count 2. And throughout their brief, they purport that article – paragraph article 3 of the agreement is designated as binding. That simply is not the fact. There is – article paragraph 3 is not included in the list of binding provisions. Essentially, Your Honors, what this appeal boils down to is a single paragraph of plaintiff's complaint. That would be paragraph 83. And when you look at count 2, first, paragraph 82 summarizes a number of provisions. It summarizes paragraph 7, paragraph 1B, paragraph 3 once it summarizes it, paragraph 3 it summarizes again, paragraph 3 and subparagraph E summarizes again paragraph 3. So the vast bulk of what is contained in this count 2 is paragraph 3, which is not a binding provision, which my colleague on the other side has conceded under any theory is gone. It's not enforceable. But then when you look at paragraph 83, which implements the provisions on which they rely, it talks about commercially reasonable efforts to execute the definitive documents. That's paragraph 3. It talks about commercially reasonable efforts to complete the transactions. That's paragraph 3, and that is also count 1, which is not being appealed, Your Honors. And I won't bore the court, but it's like that throughout paragraph 83. And frankly, with all respect, I think there is no excuse for stating in their briefs over and over that paragraph 3 is in the binding section. Counsel tried to give some rationale for that. Frankly, it didn't make sense to me, but there is no legitimate rationale. The contract has words. This Court's job, obviously, is to interpret those words, and the plain words of this contract say paragraph 3 is not binding. Also, with respect to Judge Niemeyer's series of questions about the statute of limitations and are we dealing with the United States here and a series of questions of Court of Federal Claims. I handle many cases in the Court of Federal Claims and the Federal Circuit, and I would respectfully submit the questions are right on target. And again, we have a problem, though. The brief, the appellant's brief before this Court does not at all line up with the complaint. The brief that is filed before Your Honors is very much different than anything that's in the complaint. Yes, Your Honor. With respect to the line of questioning, I think Judge Niemeyer also had in the response that there is a case that would allow this case to proceed in federal district court, and I'm curious as to how that case can supersede the language of the Little Tucker Act, Section 2401, which vests exclusive jurisdiction in the Court of Federal Claims for contract claims against the United States for over $10,000. I've read the auction decision many times, and Your Honor, I don't see anything in that decision that would supersede it. Because if you actually look at the complaint, because obviously we're here on a motion to dismiss that was granted by the district court. So the operative document is the claim before the court. And let's look at what the complaint in this case says with respect, Your Honors, to the United States. What the complaint says is, and let me just read the right paragraph, Your Honors, just for the Court's indulgence for just one second. The complaint says, paragraph 15 of the complaint, and this is the entirety of the allegations, Your Honors, with respect to are the parties to this contract, FHFA and Freddie Mac, FHFA in its capacity as conservator, excuse me, and Freddie Mac, the United States. Paragraph 15 states, Freddie Mac is subject to the conservatorship of FHFA, and as such is an instrumentality of the United States government as FHFA, as the conservator succeeded to the rights, titles, powers, and privileges of Freddie Mac, and it continues. But a couple points on that, Your Honors. In their appeal, that point is abandoned. I believe, if I'm recalling the page number, at page 25 of appellant's primary brief, and my colleague perhaps can help me if I have the wrong page, but it's made clear that they no longer are advancing that proposition because it's not consistent with the Supreme Court's O'Melveny decisions, with the host of case law. So their brief concedes now that that's not correct. They are not saying my clients are the United States of America on the basis of the mere fact that there is a conservatorship. And they have invented this entirely new theory that there's some type of agency going on here, and that alleged, well, let me step back, not alleged, that agency relationship that is not alleged in their complaint should cause this court to find that the United States of America is a party. I would say two things. One, nowhere in the complaint does that appear. It's too late now to come up with brand new extravagant theories that are not in the complaint. But even if it were in the complaint, this agency notion, that doesn't turn my clients for purposes of the statute of limitation into the United States of America. And I would submit that when you're looking at whether the six-year statute of limitations apply, the court would be looking at, well, who are the parties to the contract? Well, the parties to the contract were my colleague's client and Freddie Mac, and they say also FHFA is conservative of Freddie Mac, stepping into the shoes of Freddie Mac. That's what the O'Melveny, I believe Justice Scalia's decision dealt with. But these arguments that are now invented, free of any attachment or linkage to the complaint, in their appellate brief deal with something entirely different. This agency theory, they never allege that Freddie Mac or FHFA acted as the Department of Treasury's agent in executing, entering into this agreement. Rather, they come up with some convoluted theory that the breach, in breaching this agreement, Freddie Mac and or the FHFA was acting as an agent for Treasury. Well, two things. One, that's wrong. They weren't. But also, even if they were, that does not transform Treasury, even under the facts that they wish they had alleged. That does not transform Treasury or FHFA, Treasury, into a party to this agreement, because it got right into your series of questions, Judge Niemeyer. The only way they could have gotten. Well, I'm not sure if your last statement would fly. If we were to have to conclude that FHFA constituted an agent of the Treasury in making its decisions, then it seems to me agents bind the Treasury, and the Treasury would be the United States. But in this case, the Treasury was an infuser of capital and opposed, as a condition, approvals. And whether they requested approval or not does not address the question of whether Treasury was the party. Each of those points are points we advance, agree with, Your Honor. The only point I was just trying to make is that in the story told by their appellate brief, there is no, even in that brief, suggestion that Treasury was a party to the agreement. What they are arguing, which is, and the Court doesn't have to accept it as a plea of fact in a complaint, because it doesn't appear in the complaint anywhere, but what they seem to be arguing in their brief is that Treasury, that my clients were acting as agents of the Treasury Department in somehow impermissibly breaching this agreement. There is no plea that Treasury, well, there's no plea about any of this, but if you treated their story in their appellate brief as a plea, there is no plea that the Department of Treasury is a party to this agreement, and it would only be if the Department of Treasury would. They wouldn't have to be part of the agreement. No. They would have to, if their agent was acting on behalf of the Treasury and entering into an agreement, they could find the Treasury, be it a disclosed or undisclosed agent. But the facts that they allege aren't that the Treasury took any role in this except to supply capital. And they said the Treasury wasn't even consulted. And so FHFA made the decision based on a Treasury decision in a parallel financing. Your Honor, I would throw out the way I state it. The way you state it is consistent 100 percent with the position of my clients, and that's our fundamental position. Your Honor, I think it was your honor, Judge Duncan, or it may have been Judge Harris, I forget, sorry. But when you're talking about the provision in the circular that referred to Treasury and the requirement that Treasury has to approve, because the story told in the appellate brief is like, oh, my God, all of a sudden this is there. Counsel said, well, maybe there was a line. In fact, that line is much more than a line, and it appears at page 211 and 212 of the appendix. But they refer, all of your honors, to what Judge Niemeyer is referring to, the underlying agreement. It says this is something that was prepared by both the plaintiffs and the defendants. It says the Treasury has taken a number of actions to support Freddie Mac during its conservatorship, including, and it goes on, but it makes it clear that Freddie Mac's ongoing business is based on what Treasury did. And it says that, after laying all out that background, certain actions require the prior written consent of the Treasury, including but not the ability to sell, transfer, or dispose of any assets, including its interest in limited partnerships. And the final line, and now this is one line, but there's all this introduction. Now, the final line, which is just totally dispositive of everything, in my humble opinion, to the extent the Treasury does not approve the sale of the limited partnership or delay such approval, the closing will not occur and the tax credits expected to be realized may be adversely affected. I mean, that is the, this offering circular, parts of it were attached to the complaint. And if my colleague comes up here and says, well, Your Honors, we opted not to attach that particular page to the complaint, I would suggest, Your Honors, that this Court, since the offering circular is attached to the Treasury, the fact that plaintiffs opted to leave out this page, which sets out this controlling condition, and Judge Kuceris dealt with this as a condition precedent that was to an agreement that was never met, I think that's the end of the story. And in trying to respond to questions before the Court, I did not make the affirmative points I want to make, but my sense is the panel already understands those points. But I would just highlight that in entering into this agreement, all this was disclosed. There are no allegations. If the Court looks at the actual complaint, there are no allegations that there was something in particular that Freddie Mac was required to do that Freddie Mac didn't do, or that there was something in particular that the FHFA as conservator was required to do, but the FHFA as conservator didn't do. There's just this story that, frankly, bears no relation to reality, but more important, doesn't appear in the complaint, so this Court is under no obligation to give it any type of credence. The Court is considering the complaint here. If I may correct a couple other things my colleague said, he said, well, there was no effort to get, in any event, the Treasury to approve, and we don't know what the Treasury did. Did it approve? Did it not approve? And, first of all, the Treasury, there's no limits on the Treasury's ability to approve or disapprove anything. The Treasury was a party, a counterparty to a contract with the FHFA as conservator, and that gave it certain rights, and one of the rights it gave it for committing upwards of half a trillion dollars, perhaps it had the right to approve or disapprove an array of possible future contracts, which clearly included this contract. In their papers, they dispute, well, was that a good deal? Why did you give Treasury that right? Well, it was for life. Treasury's investment gave the enterprises life and the ability to operate and the ability to serve the central congressional goal of allowing the United States mortgage markets to operate. So I think the challenges that appear in the appellate brief but don't appear in the complaint that the FHFA was somehow acting badly in giving Treasury this approval authority, there's nothing to that. But with respect to the point being made by my colleague that no approval was asked for, no approval was either given or not given, if the Court were to look at page 58 of the Joint Appendix, in that the Court will find a letter from the then-Acting Director, Edward DeMarco, to Charles Halderman, the Chief Executive Officer of Freddie Mac. It's dated November 23rd. And right in the first sentence, it says, Freddie Mac has requested consent of FHFA to approval of its disposal to dispose of low-income housing tax credit. And there are statements in the appellate briefs, I don't recall the page, where plaintiffs say that didn't happen. But the important thing I want to focus on is Mr. DeMarco says, I have discussed the Project America transaction with Treasury. In view of the discussion, and he makes it clear, in view of those discussions, no approval is forthcoming. So the discussions occurred. I see I just have just over a minute. A final point I'll make is plaintiffs make much of the Perry Capital versus FHFA case. And I'll note that that wasn't submitted as supplemental authority. I'll note that I am very familiar with the case. I argued it before the D.C. Circuit. And I welcome the Court to read the entirety of that opinion, if it already hasn't. In fact, there's nothing in that case that supports any of the claims being advanced. But with respect to the agency point, since they've now put this decision into a controversy, I would refer the Court to footnote 9 of that decision, because on this agency point that has recently been invented, plaintiffs rely on 12 U.S.C. 4617A.7. And this footnote succinctly states why there is no legal merit whatsoever to those contentions made here today. And another case that plaintiff cites in their papers, the Robinson case, which we presented to the Eastern District of Kentucky in Pikeville, that makes it clear that parties such as plaintiffs are not in the zone of interest to have standing to prosecute claims under that statute. My time is up. Unless the Court has any more questions, I will take my seat. Thank you, Your Honors. Roberts. Mr. Eichel. Eichel. Thank you. Mr. McCain blatantly has the wrong standard that should be before this Court. On affirmative defenses like statute of limitations, Meridian is not required to plead affirmative facts to defeat an affir to defeat statute of limitations or any other affirmative defense. It can't be required to plead facts before you know you're going to raise facts. Yeah, but our jurisprudence has said that if you do plead facts from which you can conclude from the face of the complaint that there's a statute of limitations problem, then it can be addressed. If there is no possibility that, based on the complaint, any facts that can be stated or proved that would allow you to defeat the statute of limitations claim, that's not the case here, Your Honor. The complaint makes clear a couple of things. One is that FHFA took action on its own. That it never, the complaint alleges, it never received from Treasury, you cannot do this. It got indications that Treasury may not consent, but FHFA made that decision on its own. It acted on its own as conservator. And when it did so, it wasn't acting in the shoes and trying to help out Freddie Mac. It turned down $3.4 billion in cash and wrote off $3 billion in assets. No sane conservator or ordinary conservator would ever do that. They'd be before the court on all kinds of charges, perhaps even criminal charges. They did it acting out of their own agency government best interest and in the taxpayer's interest because the tax credits would ultimately not have to be honored. That's an additional element. If you look at the O'Melveny case and all the cases cited by the district court, every single one of those cases says that merely because it's a conservator doesn't make them the United States. Or in this instance case, the auction company case is very clear about the O'Melveny case and the weight it should give it in terms of statute of limitations. It says it has no bearing, no importance, no weight. It wasn't speaking about the statute of limitations. And in those cases, it talks about how the context is key. We're not saying that because FHFA had just the tag, the conservator, that every case against them, they're the United States for statute of limitations purposes. Isn't that a little bit how your complaint reads? Yeah, I don't believe so because the complaint also goes on and it talks about how FHFA wasn't acting as the conservator or in the role of traditionally the conservator. It was making decisions based upon overall taxpayer interest and things that were antithetical to what the notion of a traditional conservator is. It's not just that there's a label. And if you look at the auction and you look at what the court's done in Fairholme, and this is consistent with the court in Slatery as well as the Supreme Court in LeBron, context is the key here, is that FHFA on its own made the decision based on its own governmental interests. That's something that in all the rest of those cases, they involve just a foreclosure, a breach of employment contract, things that didn't involve the other elements, unique elements of FHA's conservatorship, which is its ability to act in its own best governmental interest and in the taxpayer's interest. And when FHFA can yield and exercise that power, that leads into that supports the arguments made in Fairholme and in auction, so Slatery and LeBron and those cases, that the context is key. You just can't, it's not just about the label. It's that they took these own actions in their own interest themselves. And I think that we can, with discovery, and I think we can prove those allegations to establish the statute of limitations and that Mr. Howard's amicus brief says FHFA's acquiescence in this, even to Treasury, shows its complete and total domination. And it wasn't fulfilling its duty to preserve and protect the assets. It was driven by other motives. The training briefing, Your Honor, to the issues of the enforceable provisions at MOU, Your Honor, the brief makes clear that Paragraph 7 is the binding provision. It talks about aiding and assisting, taking affirmative action, structure and complete the transaction. The brief makes very clear, we believe that Paragraph 3, there's some separate enforceability, but it informs what Paragraph 7 is about. And what's important, our client gave up their core business to get that binding provision. They weren't going to engage in the sale of tax credits. They spent over $6 million in attorney fees and legal costs. And they gave up lots to get the binding provision and having an expectation that the other party at least asked for the approval. Scalia. What's your response to the offering which refers to the risk of having to get Treasury's approval? To your investors, you described the risk of having to get it. Now, do we discount that and say that was not a real risk? You sort of recognize that Treasury has the right to approve. A couple of things, Your Honor. One is that they didn't approve or disapprove. They never asked. They never formally asked them. They never had to ask them. They said it was pending and they'd had a discussion. But regardless of that, set that aside. It seems to me that all of these contingencies, you're trying to enforce an understanding that's dependent on a lot of approvals, including the FHFA and including Treasury. And you recognize that at the time. And when the approvals doesn't come through, of course, you're unhappy. You've spent a lot of money. But that's the risk you undertook in engaging in the MOU and trying to make it a deal, make it go. Your Honor, I think a couple of points. One is that I think our client's position is that, I mean, that contract is between our client Meridian, Freddie Mac, FHFA, was a conservator. That contract never specifically requires Treasury's consent. What are you saying then? You said it in the offering. You're disclosing this to your investors that we needed that. Your Honor, it was a warning in the prospectus in the 500 pages of documents. So it's meaningless because it's put in there? That's put in there for a reason. It's put in there because the entire vitality of Freddie Mac was dependent on the investment by the Treasury. They put in, what, $500 billion into the Freddie Mac to keep the market going. And they had conditions attached. And those conditions would have been one of the approvals that you recognize. Now, when all of a sudden the Treasury says, we put in $500 billion of taxpayer dollars, we don't want to give back those credits and increase to $503 billion, or whatever the amount of the tax credits in this case were. That's up to Treasury. Now, whether they approved or not, it's still a totally contingent deal. I mean, your complaint makes it sound as if everything was approved, everything was agreed to. The only thing we were missing were the signatures on the closing documents. But, Your Honor, in terms of Treasury, Treasury was just a shareholder. But they had some say. Didn't they have some say? They actually had a document between Freddie Mac and the Treasury as to the conditions for putting in that money. And as a shareholder, they didn't act in shareholders' interest. They didn't act in shareholders' interest if they never gave, they never denied permission. But if they had, they weren't. We're not talking about the substance of whether they were right or wrong. We're talking about whether your deal was dependent on their approval. I think that our contract, that's a contractual relationship between Freddie Mac and Treasury. Yes, it was. But you're recognizing that Freddie Mac had other arrangements that they had to accommodate. They couldn't enter into your deal without consulting their investors. And basically, the investors in this case was the Treasury. That is an acknowledgment that was made in a warning prospectus, and that approval or denial never actually came, Your Honor. But you were informed that they were acting based on consultation with Treasury. I'm just not understanding the significance you attach to the existence of a formal disapproval. I think that's a large part. It's a factual inquiry. But they had some discussions that there was another deal proposed by Frannie that had a lot of different elements to it, one of them being that that deal involved Goldman Sachs, who was getting a lot of pushback because they just had received the 100-to-100 payout, and that deal was structured differently. It wasn't our deal at all. And so they had discussions. They had some discussions with Treasury, and they got the impression that you can have discussions with a party, and that's a lot different. I think there's an obligation in a contract. If you're going to not consummate a deal that's 500 pages, that's ready to go for signature because a third party gives you an impression, we may not agree to this. Do you allege they didn't seek authority and approvals? Yes. And we allege it in the complaint. Well, how did that letter? Is that letter part of the complaint? It's attached as the complaint. Well, the letter says explicitly we have sought authorization, and it hadn't been given yet, but clearly they sought it. And what the denial letter is that terminates the deal that's also attached to the complaint says is that we think Treasury will not approve this. That's fair enough. That goes to whether they acted rationally, but that doesn't go to the fact of whether they sought approval. The approval was pending, and if they demanded a written disapproval, they could have gotten it maybe, but your complaint alleges that they never consulted. They never sought. I think that the denial letter goes further. And the denial letter makes it clear that they never actually sought formal approval. It says the very first sentence. I can give you one second. I can get a copy of the two exhibits. I've read it. You've read it. Why don't we continue to review this? And thank you for your argument. We'll adjourn court for the day. Thank you. Thank you for consideration. This honorable court stands adjourned until tomorrow morning. God save the United States and this honorable court.
judges: Paul V. Niemeyer, Allyson K. Duncan, Pamela A. Harris